MARK PREWETT, Appellant, v. WILLIAM C. COOPWOOD, Appellee.

1. DEMURRER: NEW GROUNDS.—New grounds of demurrer, not assigned in the court below, will not meet with the least favor in this court, unless it be manifest, that the court could not entertain jurisdiction over the subject-matter, or could not under well recognized principles, grant relief upon the case made by the bill.

2. FRAUDULENT ASSIGNMENT.—Equity will grant relief to the administrator, against the fraudulent assignee of his intestate's property, if it appear that the assignment was procured by the fraudulent conduct of the assignee.

3. SAME.—C. in his last illness, and when generally debilitated in body and mind, made a conveyance of his property to his brother-in-law, P., clothed with a secret trust, for the benefit of his wife and child, under the mistaken apprehension, produced by the false and fraudulent representation of P., that unless such conveyance were made, his estate would be taken to pay an alleged security debt; after C.'s death, his administrator filed his bill to recover the property for the benefit of the wife and child, there being no debts; and the court decided his suit was maintainable, and that he was entitled to recover.

4. VERDICT: WHEN SET ASIDE.—The question for this court to determine, in considering whether the verdict of a jury is sustained by the evidence, is not, is the verdict clearly right, but is it manifestly wrong?—and the verdict must stand, unless a clear preponderance of the evidence is against it.

5. PLEADINGS: DEFENCE.—A defendant will not be permitted to set up a defence on the trial, inconsistent with the statements of his answer.

6. ADMISSIONS: EVIDENCE.—The admissions of a party, are the strongest or weakest evidence, according to surrounding circumstances, and it is for the jury, and not the court, to determine upon their value, in a particular case.

7. SAME.—In a suit by the administrator of an intestate owing no debts, the admissions of a distributee are not competent evidence for the defendant; such admissions would have the effect to diminish the recovery, and to that extent would affect the interest of the co-distributes.

APPEAL from the District Chancery Court, at Fulton. Hon. Henry Dickinson, vice chancellor.

On the 5th day of March, 1845, the appellee, William C. Coopwood, as administrator of one John C. Cherry, filed his bill in the court below, in which he alleged in substance:—That John C. Cherry died in Monroe county, in this state, on the 13th day of June, 1834, intestate, leaving a widow, Eveline Cherry, and an infant son, Newell C. Cherry, who are still alive. That said Cherry, during his last illness, owned the following slaves: Lum, Sally, and her four children, viz.; Amanda, Morrow, Addison and Nancy, with other personal property; also $500 in money, a a note on Willis Persons, (who was solvent,) for $500, and a note on William Walton, (who was also solvent,) for about $1500. That all this property came to the hands of the defendants, Mark Prewett and Abner Prewett, who were brothers-in-law of said John C. Cherry, and that they now have the negroes, and have collected the notes, and used the proceeds for their own benefit.

The bill then charges, "that the said Abner Prewett and Mark Prewett, combining and confederating together to cheat and defraud the said John C. Cherry, in his lifetime and during his last illness, which was slow and protracted, and when he was generally debilitated in both body and mind, and his days were evidently but few in this life, and availing themselves of that advantage, undertook to persuade and did persuade the said Cherry, and induce him to believe, that in the event of his death, all of the slaves aforesaid, and the notes and money aforesaid, would be taken from his wife and infant son to pay debts, for which they alleged he was liable as indorser for one Crane; all of which was a mere pretence, and only intended to alarm the fears and apprehensions of said Cherry, and influence him to make such conveyance of the said negroes, and money and notes, as would in the opinion of said Abner and Mark Prewett, vest the said property in them."

The bill further charged, that by these devices and misrepresentations, the said Cherry was induced to make a bill of sale to the slaves; and to deliver possession of the other property to said Mark and Abner Prewett, whom he regarded as his friends, and in the full confidence that they would faithfully appropriate the same

to his widow, their sister, and to his infant son their nephew. That the said Prewetts, the more certainly to succeed in their scheme of fraud upon their feeble victim, pretended to pay money to said Cherry on his death-bed, for said negroes and property, by handing a paper to him containing money, as Abner Prewett alleged, but that the said paper was immediately handed back to said Abner, without one dollar having been counted by said Cherry, or to him, by any other person. That Abner and Mark had received on the notes before mentioned, about $2500, and that they have failed, and refused to deliver up the negroes, or contribute one cent to the said widow and child, or to the debts of said Cherry, if indeed he were indebted at the time, and that they now refuse to account with complainant as administrator.

Prayer, that the sale of the slaves be declared null and void, and for a specific recovery of the property, and for an account, and for the recovery of the money that might be found due thereon.

Defendants demurred, and for cause assigned, as stated in the opinion of the court. The demurrer was overruled, and the defendants then answered. Mark Prewett answer was in substance : That he knew nothing of the sale of the slaves by Cherry, to A. Prewett, except what he had learned from them. That he was informed by John C. Cherry, that he had sold the negroes to Abner Prewett, for $1500, which had been paid to him, and that Abner had told him the same. Denies that he was present at the sale, or advised it, or had any connection with it. Denies all knowledge of any money being in possession of said Cherry, at the time of his death, or of any notes on Walton or Persons, or any one else ; and if there were such, he knows nothing of what became of the money or notes. States, that Cherry died at his, Prewett's house, and the sale of the negroes took place, as he was informed by the parties, three months before Cherry's death, and when he was able to ride about : and " denies all, and all manner of unlawful combination, fraud or confederacy, wherewith he is by the said bill charged."

Abner Prewett answered, that he did buy the negroes mentioned in the bill; that he bought them three months before Cherry's death, and paid $1500 for them, which was their full value; that

Cherry informed him that he was involved, and wished to sell the property to pay his debts; that the money was never returned to him, and he does not know what became of it. Denies that he induced said Cherry to sell the slaves, or that he made any promise to him, that he would hold them for the benefit of his widow and son; but that he purchased in good faith from said Cherry, at a time when he was fully able to contract; states, that if Cherry had $500 at the time of his death, he knows nothing of it; that he never received any of it. That he purchased a note on Willis Persons, from said Cherry; that this was done some six or eight months before Cherry's death; that Cherry came to him at that time, and informed him that he had collected and used other people's money, and was obliged to have cash to refund it; and thereupon, he, Prewett, advanced to Cherry, in payment of the note, the full amount thereof, and took an absolute transfer of the same; that it was his *bonâ fide* property; and that no part of the sum advanced had ever been returned by Cherry, or any one else for him.

The answer also contained a general denial of fraud and fraudulent combinations, &c.

The evidence on the part of complainant, was as follows:—

Michael Baily, testified, that on the 1st day of January, 1835, he collected a note on Willis Persons, payable to John C. Cherry, for $480; that said note was handed or sent to him by Abner Prewett; and that he acted as agent for said Prewett.

Mrs. Rugsdale, stated, that John C. Cherry sold his negroes to A. Prewett, some two or three weeks before his death, as she learned from John C. Cherry, and that he was confined to his bed for two or three months before he died; that Cherry showed her the money he said he got for them. That he said he was indebted, and that the money would do his wife and child more good than the property.

Lucian B. Moore, testified, that a short time before John C. Cherry's death, as he now recollects, Mark Prewett told him that Cherry had given him his son, Newell Cherry, and that something was said about Newell C.'s property, but he could not say what it was.

Prewett v. Coopwood.

James G. Armstrong, stated, that he had heard Abner Prewett state several times, that he had bought the negroes in controversy from John C. Cherry, for $1500, and paid for them, and that he "would do what was right for his sister," Mrs. Cherry.

Mrs. Burnett, stated, she was sister of Abner and Mark Prewett, and of Mrs. Cherry, now Mrs. Coopwood; that John C. Cherry was very feeble and low for a long time previous to his death; that Abner Prewett had in his possession the negroes owned by Cherry a short time before his death; that Abner Prewett said he had bought and paid for them. That she had frequently conversed with Abner Prewett on the subject of Mrs. Cherry's affairs; that some year or two after Mrs. Cherry had intermarried with George W. Coopwood, the witness told Abner Prewett, "if he had any of her (Mrs. C.'s) property in his hands, that he ought to give it to her;" he did not say whether he had any of her property or not. He stated that no one knew any thing about it but himself, nor should know; and had so told Mrs. Coopwood. He also spoke of having spent money in attending to her business at Pontotoc. I then suggested to Abner Prewett, that I supposed the reason why he had not paid over to Mrs. Coopwood (Cherry,) her property, if he had any, was, that Mr. George Coopwood, her husband, was in bad health, and embarrassed; to which he replied, "Not so bad, considering."

*Cross-examined.*—Did not Abner Prewett, in the conversation referred to by you, tell you, as a reason for not talking about Mrs. Coopwood's business, that a suit was pending in Pontotoc Circuit Court against Willis W. Cherry, about John C. Cherry's business, and if he told what he knew, he might be made a witness, to the injury of Mrs. Coopwood; all of which he had submitted to Cherry's lawyers? *Ans.*—I am unable to relate the conversation particularly, but it was something like that.

She also stated, on cross-examination, that Mrs. Cherry, after the death of John C. Cherry, and before her marriage with Coopwood, had no money or property, except a horse, so far as she knew, and that if she had had more, witness thinks she would have known it.

Mrs. Eveline Coopwood, formerly Mrs. Cherry, after having

released her interest in the estate of John C. Cherry, testified as follows:—That she was the widow of John C. Cherry, and sister of defendant; that the sale of the negroes mentioned in the bill, took place some five weeks before the death of said John C. Cherry; that she was not present at the sale, and knew nothing of it until after it was completed, and a bill of sale given. That after the sale Abner Prewett told her, that from a conversation with her brothers and father, it was considered that her interest would be best promoted, by his purchasing the negroes; that it would exonerate them from a security debt; that Mr. Cherry was bound for one William Crane; and that at any time afterwards, when it was considered advisable, he would give the negroes up to her, and to give herself no uneasiness about them; that she was acquainted with the pecuniary condition of John C. Cherry; that he left no money at the time of his death; that some six or eight weeks before his death, he used some money in the purchase of a note from one Duncan, and that after that he made no contract, except the one about the negroes, and paid out no money; that he was so feeble that he was unable to go about, and could only sit up a few minutes at a time; that he was not indebted at the time of his death; that she knew of no debts, and had not been called on to pay any; that on the day of the sale of the negroes to Abner Prewett, John C. Cherry handed her a paper folded up like a letter, containing money, and that she handed it to Kirk Prewett, and he to Abner Prewett; and that Cherry afterwards told her it was the same money paid to him by Abner Prewett for the negroes; that on the day of the sale Abner Prewett thought Cherry would die in a very short time, and Cherry was also of the same opinion; that Abner Prewett told her, that the negroes would be taken for a security debt, if they had not been sold; but that Mark Prewett had never said anything to her on the subject; that some two or three years afterwards, Abner Prewott told her that Mr. Coopwood had as much of his means as was coming to her, and that he had Newell's in his hands, and asked her what to do with it; that Abner Prewett told her that Willis Cherry had collected the money from the marshal—the money due on the Walton note—and that they had concluded that it was best for them to

lay the money out in land, for the benefit of her and Newell C. Cherry; that she was present when the note on Persons was transferred to Abner Prewett; that John C. Cherry stated, he did not wish to send the note back in his own name, on account of the suretyship for Crane, and thereupon indorsed it to Abner Prewett.

*Cross-examined.*—Witness stated, she had not said that she knew nothing of the sale of the negroes to Abner Prewett, and that he had always refused to tell her anything about it. She had said she knew nothing of the sale at the time. Abner Prewett told her all she knew about it, and for the last few years had refused to say anything about it, except that he would do right. That she did not tell D. Prewett and Louisa Morgan that Abner Prewett had never told her anything about it, and that she knew nothing about it herself. That John C. Cherry, to the best of her recollection, died about five weeks after the sale. That her knowledge in relation to Cherry's indebtedness, was derived from his statement, that before he moved from Tennessee he had settled all his debts, except the security debt for Crane; and that she had heard of no debts since his death. That it is true her father had paid some small debts, but they were contracted by herself during Cherry's last illness, and she did not consider they were due by Cherry; and that her father got of her means sufficient to pay them; that her means spoken of, consisted of a horse, and some rent due her for her dower in her former husband's land. That no money was in possession of Cherry when he died, and that none was received by her since. That she did not, soon after Cherry's death, tell John B. Prewett that the means of Cherry was in money, and in her hands.

G. W. Coopwood, having released his interest, testified, that he heard a conversation between Abner Prewett and his wife, in relation to the property belonging to the estate of John C. Cherry; that Mrs. Coopwood told Prewett that she wanted the negroes belonging to the estate of John C. Cherry—that she had been without them for a long time; and he answered, that he never intended to wrong her out of a cent, but at the proper time would do what was right. That Mark Prewett had, on divers occasions, told him that he had in his possession some $1500 or $2000, belonging to

Newell C. Cherry, son of John C. Cherry, and that he was willing, at any time, to divide that money between Mrs. Coopwood and Newell C. Cherry.

Mary C. Cherry, stated she was a sister of John C. Cherry; that about a year after his death she visited Mark Prewett, to see her brother's widow and child, and also to ascertain what disposition he had made of his property; that Mark Prewett then told her that he had given a written pledge to John C. Cherry, that when Newell C. Cherry arrived at the age of twenty-one years, if the negroes and money which John C. Cherry had left him, in the hands of said Mark Prewett, and interest on the money, did not amount to a sum equal to that which Mark Prewett's daughter would then have, that he, Mark Prewett, would make it equal. That Mark Prewett also told her that John C. Cherry had left his negroes and money in the hands of Abner Prewett and himself, (except the note on William Walton, for $1500,) for the widow and infant son of said John C. Cherry. The $1500 note on Walton was collected by Willis W. Cherry, and by him paid over to Mark Prewett.

W. W. White, stated that he heard Mark Prewett say, five years ago, (the deposition was taken in 1846,) that John C. Cherry had given him his son Newell, and two thousand dollars, or upwards, in money, and that he intended to keep Newell and the money.

For defendants, John B. Prewett testified, that in 1835 or 1836, Eveline Coopwood told him that she did not expect to be able to live on the interest of her money, but would have to use part of of it; that what she had was in money: and that in 1841, she told him that Abner Prewett had paid for the negroes, but that the money had been returned to him.

Elisha D. Prewett, stated that in 1844, he had a conversation with Eveline Coopwood, when she stated that Abner Prewett had bought and paid for the negroes, and that her reason for suing him, was, that she did not know what became of the money; and she would not begrudge all the negroes were worth, to know what had become of it. Witness suggested, that possibly Lemuel Prewett, her father, had something to do with the money, as he had given her in his will more than he had his other children.

Prewett v. Coopwood.

Kirk Prewett, stated that he was not present when the negroes were sold by Cherry to Abner Prewett, nor did he see any money pass in relation to the sale; and that Mrs. Coopwood never handed him any paper to be handed to Abner Prewett. Cherry was taken to his house after the sale, and he had conversations with him both before and after that time; and that in substance, he stated that he owed money that must be paid; and that whilst he lived he was to be supported out of the proceeds, and if anything remained, it might go to his wife and child.

*Cross-examined.*—He conveyed a paper from Abner Prewett to J. C. Cherry: whether it could contain bank notes or money, he could not say: does not know what the object of it was. The paper was not larger than a common letter, and was unsealed. This occurred about the time of the sale.

' D. H. Morgan, stated, that in 1835 or 1836, he heard Willis W. Cherry state that he had money in his hands belonging to John C. Cherry's estate, and that he expressed a wish to see Lemuel Prewett in relation to it.

Louisa Morgan, stated, that in 1841, she heard a conversation between Eveline Coopwood and her (witness's,) father, Abner Prewett; that Abner Prewett charged her with having stated that he had funds of hers in his hands, when she denied having made the statement, and said she did not know what had become of the funds. Witness then charged Eveline with having stated that her father, Abner Prewett, had funds of hers in his hands, and that his family was living off of her—which she also denied.

Miss M. C. Cherry, re-examined, for defendant stated, that she did not mean in her first deposition, to state that she knew that Willis Cherry had paid the money received on the Walton note, to Mark Prewett; she was so informed by W. W. Cherry, and that was all she knew' on the subject. That George Coopwood had told her that John C. Cherry's negroes were left in the hands of Abner Prewett. That she told George Coopwood, when her first deposition was taken, that she derived her information in relation to Walton's note, from W. W. Cherry. Sarah T. Dyche, stated that she heard Eveline Coopwood say, last spring, that she did not

know whether or not anything was coming to her from defendants, but if there was, she wanted it.

J. J. Standifer: In 1843 or 1844, George Coopwood told me he was about instituting suit against Abner Prewett, to recover some twelve or fourteen negroes coming to his wife, from John C. Cherry's estate. That he knew nothing of the matter, except what his wife had told him, and from what she said, he had no doubt he could recover.

Elisha D. Prewett: That since the commencement of this suit, he had a conversation with George W. Coopwood, in relation to it. That Coopwood said, that he knew nothing more about the business than he had before known; that he had nothing to do with it; that it was Eveline and Thomas Coopwood who were prosecuting it. He agreed with me, that most probably my father, Lemuel Prewett, had got the estate, and that he was confirmed in this, from Mark Prewett's wanting his father to give him Newell Cherry's share.

S. J. Gholson, stated, that John C. Cherry told to him, in connection with a business transaction, that he was broke; this was in 1831 or 1832.

John B. Davis, stated, that he was well acquainted with John C. Cherry, and that he had repeatedly told him, that he, Cherry, had been unfortunate in business, and was insolvent, and that he was so regarded up to the time of his death.

At the November Term, 1850, the vice chancellor dismissed the bill as to Abner Prewett, and ordered an issue to be sent to a jury, as to Mark Prewett. From this decree the complainant appealed, and this court reversed the decree, so far as it dismissed the bill as to Abner, and directed that the issue submitted to the jury should include him. Whereupon the following issue was directed to be certified to the Circuit Court of Monroe County, viz., "Whether the defendant, or either of them, have received any, and if yea, what property from John C. Cherry, in his lifetime, and whether they or either of them hold any property, and if yea, what property, in trust for, and rightfully belonging to the estate of said John C. Cherry."

Upon the trial of this issue, the foregoing testimony was intro-

duced, and also the will of Lemuel Prewett, by which he gave to E. D. Prewett four negroes in trust, for Eveline Coopwood for life, and then to her children. Kirk Prewett, for defendants, also swore that at the time of making the will, and at the death of said Lemuel, he and Mrs. Coopwood were unfriendly.

John B. Prewett, was next introduced by defendants, who offered to prove by him, that on the day of the conversation between himself and said Eveline Coopwood, spoken of in his deposition, the said Eveline told him, that her money was in the hands of her father, Lemuel Prewett. The complainants objected, and the court sustained the objection, and the defendants then excepted.

The jury found the issue in favor of Abner Prewett, and against Mark Prewett, and assessed the amount of property in his hands at $4918. Mark Prewett moved for a new trial, when it was overruled, and he excepted.

The vice chanceller, upon the rendition of this verdict, entered a decree accordingly, and from this the defendant, Mark Prewett, appealed.

*Sale* and *Phelan*, for appellant.

This was a bill filed by Coopwood, as administrator of John C. Cherry, against Mark and Abner Prewett, to recover of them certain property, alleged to be in their possession, belonging to said plaintiff's intestate.

The testimony in the record is rather lengthy, but a *legal* principle, which arises on the face of the bill, will relieve the court of the labor of its examination.

The bill charges, that the property in controversy came into the defendants' possession upon a *a sham contract, understanding or agreement between the Prewetts and the said Cherry, plaintiff's intestate, to defraud creditors, in confidence that they would hold it for his wife and children!*

The defendants filed a *demurrer* to the bill, which was *overruled!*

That the *demurrer* should have been *sustained,* is settled so definitely, as only to require a statement of the point. *Parties* to a fraud, and their *representatives,* are bound by it. *Creditors* and *purchasers* only can object. *Your honors* have emphatically

asserted the principle in two decisions. *Armstrong* v. *Stonall*, 26 Miss. (Cushm.) 275; *Ellis* v. *M'Bride*, 27 Ib. 155.

2. As to the sufficiency of the facts to sustain the decree.

The bill was *dismissed*, as to Abner Prewett, and a decree rendered against Mark Prewett, for the sum of $4918. We may be pardoned the remark, that a more *unjust* decree, or one based upon more *flimsy proof*, was never rendered. This assertion we shall sustain. Before examining the testimony, we desire to call the *attention* of the court to *one fact*, of the highest importance to Mark Prewett, which is this. That by making Abner Prewett a party, the plaintiff *sealed the mouth* of the man, who, of *all* others, knew most about the subject-matter of the bill. *His* testimony would have at once relieved Mark, as to the charges against *him*, but he was denied it, in consequence of Abner's position on the record. He has *now* been dismissed, and can give the testimony which truth and justice demand, on another trial.

Let us now look at the proof.

It is not pretended, that Mark held any of the *slaves* in controversy; and all the testimony on that point, may be laid out of view for the present. It is *money* which, as they say, was placed in Mark's hands, that the *proof* is relied on to establish, and to sustain the decree.

As to the *quantity* of proof required in this case. The bill is *not* sworn to; the *answer* directly denies its allegations, and *is* sworn to. " *Two* witnesses, or one witness and strong corroborating circumstances, are required to overthrow it." This case does *not* come within the statutory rule, which dispenses with that amount of proof in certain cases. (Gode, 771.)

The bill is filed by John C. Cherry's administrator, to recover *money* held by Mark Prewett, for *his* estate. This is sought to be shown, *not by facts and circumstances*, from which the conclusion is to be drawn. *This* character of proof is not pretended. The plaintiff relies *only and solely*, upon the *declarations* of Prewett. This is often the strongest or weakest sort of testimony; but without applying the usual tests in determining its weight, it will astonish the court when we declare, *that there is not one solitary*

declaration of *Prewett in the whole record*, which confesses the most remotely that he held money due John C. Cherry's estate!

We here collate *all* the *conversations* of Prewett, contained in the testimony on the point, that the court may see at a glance, their combined force.

1. L̇. B. Moore, says: "Prewett told me that Cherry had given him his son *Newell ;* and as to his having any of his means, I do not recollect what was said in relation thereto ; but the *child* and *his* means were spoken of at the same time," &c.

2. G. H. Coopwood: "I heard Mark Prewett say, that he had in his possession, some fifteen hundred or two thousand dollars, *belonging to Newell Cherry*, son of John C. Cherry," &c.

3. M. Cherry: "Mark Prewett told me, that if, when Newell Cherry arrived at the age of twenty-one, the negroes and money, which John C. Cherry, deceased, *had left to his infant son, Newell Cherry, in the hands of the said Mark Prewett*," &c.

4. White says: "I heard Mark Prewett, I think, five years ago last winter, say, that John C. Cherry, deceased, gave him his son, *Newell Cherry*, and two thousand dollars, or upwards of *his* money, and that he intended to keep Newell, and said money."

Where is now the proof, that Mark Prewett holds money, to which this plaintiff, *the administrator of John Cherry*, is entitled? There is *not* a particle of it ! Give it the full weight of *credible* testimony, and it only proves Prewett's admission, that he held money belonging to *Newell Cherry*. What right has John C. Cherry's *administrator* to this money ? None, none ! If Prewett really holds money for *Newell* Cherry, it can only be recovered by *him*, or *his* representative.

If, therefore, we are right in the assertion—*as we are*—that the declarations above copied are the evidence upon which the decree is based, it would seem a needless labor to extend this brief. *The decree cannot stand.*

3. We may take a step further, and say that even had this bill been filed properly by *Newell Cherry*, the testimony above quoted would be insufficient to sustain the decree. The *witnesses* who detail those conversations, are contradicted and overwhelmed at the bar.

*Fulton Anderson*, for appellee.

This was a bill filed in the Vice Chancery Court at Fulton, by the defendant in error, as administrator of John C. Cherry, deceased, against the appellant, and one Abner Prewett, to recover back certain slaves, and obtain an account of certain moneys, obtained by the defendants under false and fraudulent pretences, from the said Cherry in his lifetime, and to hold the defendants liable for the same.

A demurrer to the bill was filed, which was overruled; and the appellant now relies on the demurrer, and insists that the bill states the case of a fraud perpetrated by complainant's intestate and the defendants, against the creditors of the former; and in such case a court of equity will not interfere.

The *principle*, as stated, is generally correct, but it does not fit the case. The bill does not allege any such a fraudulent arrangement. On the contrary, it alleges that the defendants *falsely* pretended that the property of Cherry might be taken from his family after his death, for his *security debts*, and by this *false* pretence induced him in his last illness, when his mind was not in condition to guard his own interests, to part with his property to them. That said pretences were false, and only intended by them to alarm the said Cherry, and induce him to do *what* he *would* not have done, but for said false pretences. There is, therefore, no ground whatever for the position of counsel for appellant.

But this question is not now an open one. After the demurrer of defendants was overruled, they answered; and after testimony had been taken, (substantially all that subsequently went before the jury,) the court, at November term, 1850, dismissed the bill as to Abner Prewett, and directed an issue to be tried by a jury, what portion of the estate of Cherry had been received by Mark Prewett. From this decree an appeal was taken by the complainant to the high court; and on the second Monday of December, 1853, this court entered a judgment reversing the decree of the chancellor, and adjudging that an issue be sent to a jury to try as to the trust or fiduciary character of both defendants.

This court could not make the decree it did, without adjudicating the question that on the allegations of the bill, if found to be

Prewett v. Coopwood.

true, the complainant was entitled to relief. The bill was dismissed by the chancellor as to *Abner Prewett*, and if the demurrer was *well taken*, the court could *not* have *reversed* that decree, which it did.

I think this statement settles the question on the demurrer, but on the general question of the jurisdiction of the court in the case, refer the court to the following authorities.    *Whelan* v. *Whelan*, 3 Cow. R. 571, 572, 575, 576 ; *Huguenin* v. *Beasely*, 14 Ves. 273 ; 6 Ib. 278; 1 Pr. Will. 310 ; 7 Paige, Ch. 461; 1 Story, Eq. §§ 234, 235, 236, 237, 238, 251; 2 Ib. §§ 1197, 1255; 1 Paige, Ch. 147.

It is urged in the second place that the testimony does not sustain the verdict of the jury.

This question also is not an open one.   The testimony which went before the jury, is substantially the same on which this court made the decree, directing the question to be tried by a jury. There was in fact no additional evidence in conflict with the complainant's proof.   The will of Mrs. Coopwood's father was introduced for the purpose of inferring from it, I suppose, that the devises therein, in her favor were intended to be in settlement of the rights of complainant against the Prewetts.   This would be at the most a *very remote* inference, and was one which the jury did not think proper to draw, against the more direct and positive evidence introduced by complainants.

If complainants had by their proof made out any *case*, then no settlement made even by the defendants themselves, with Mrs. Coopwood, would be available to them to prevent a recovery by the administrator.

This sort of feeble, circumstantial testimony is relied on to rebut proof which must have been satisfactory to the jury, of the fraud charged against Mark Prewett.

What was that proof?   In the first place, the *answer* of *Mark Prewett* must be considered as substantially an admission, that he had the money of the deceased in his hands.   He denies that he knows any thing of the transaction in reference to the negroes, but though charged *explicitly* with fraudulent devices and pretences, by which he obtained possession, not only of *five* hundred dollars

in money, but of $2000 in solvent notes, he entirely *fails to answer these allegations*, but contents himself in response to the allegations of the bill, so positive and direct in their character, with saying generally, that "*he denies all and all manner* of unlawful combination, fraud or confederacy, wherewith he is charged."

This answer was enough in itself to condemn him. No *criminal* caught in the act, could have said less.

Take in connection with this answer, the depositions of M. Bailey, Mary T. Rugsdale, Mrs. Prewett, G. W. Coopwood, Mary Cherry, and William White, who proved frequent admissions of Mark Prewett, that he had the *means* of John C. Cherry in his hands, to the amount of over $2000, and that he always refused to make any explanation, and the case is conclusively made out.

Not only is it a case on which the court will feel bound not to set aside the verdict of a jury, but it is a case in which the jury was bound to find the verdict that they did find. If there was a conflict of evidence, or if defendants sought to assail the credibility of any of complainants' witnesses, which they seem to have done, these were questions which the jury only could try, and their verdict must be conclusive.

This is (more than any other case that I have met with,) one that falls within the rule laid down by this court, not to disturb a *verdict* unless it is manifestly and clearly contrary to the evidence. First, because there was great conflict in the testimony, and as to the credibility of witnesses; and second, because on the evidence as it is proved in the record, this court determined that the verdict of a jury ought to be had to determine the question of fact.

On this point I refer the court to 1 S. & M. 381; 5 Ib. 21; and 10 Ib. 313.

Under all the circumstances, the verdict of the jury was the only proper mode of settling the disputed fact in this case, and the court ought not to disturb it.

*W. F. Dowd*, on same side, filed an elaborate written argument, and cited and commented on the following authorities. *Whelan* v. *Whelan*, 3 Cow. 571; 6 Ves. 278; 14 Ib. 273; 1 Pr. Wms. R.

310; 10 Eng. Ch. R. 188; 7 Paige, Ch. R. 461; 1 Munf. 526; 1 Story, Eq. §§ 234-238, 251; 2 Ib. §§ 1197, 1198, 1255; 1 Paige, Ch. R. 147; 1 S. & M. 381; 5 Ib. 21; 10 Ib. 313; 12 Ib. 608.

FISHER, J., delivered the opinion of the court.

The complainant, as administrator of John C. Cherry, deceased, filed this bill in the Vice Chancery Court at Fulton, for the purpose of recovering from the defendants certain property and money, which it is alleged they received from the intestate a short time before his death.

The defendants below demurred to the bill, and the court overruled the demurrer. The causes of demurrer assigned are:—

1. The bill does not show when the complainants took out letters of administration.

2. The bill does not make *profert* of letters of administration.

3. Complainant has a remedy at law, and;

4. "The bill is otherwise defective and ambiguous."

It must now be presumed, that these were the only objections on argument of the demurrer in the court below, brought to the notice of the chancellor; and hence other grounds of demurrer assigned in this court for the first time, should never meet with the least favor, unless it be manifest that the court could take no jurisdiction over the subject-matter, or could not, under the well recognized principles of equity, grant relief on the case as made by the bill. These remarks are made with special reference to a point now made for the first time, by the appellant's counsel, to wit: That it appears upon the face of the bill, that the object of the intestate, in placing his property in the hands of the defendants, was to defraud his creditors. The allegations of the bill on this subject are as follows, to wit: "Your orator charges, that the said Abner Prewett and Mark Prewett, combining and confederating together to cheat and defraud the said John C. Cherry, in his lifetime, and during his last sickness, which was slow and protracted, and while he was generally debilitated in both body and mind, and his days were evidently but few in this life, and availing themselves of that advantage, undertook to persuade and did persuade the said Cherry, and induce him to believe, that in the event of his death, all of the

slaves aforesaid, and the notes and money aforesaid, would be taken from his wife and infant son, to pay debts for which they alleged he was liable, as indorser for one Crane; all of which was a a mere pretence, and only intended to alarm the fears and apprehensions of the said Cherry, and to influence him to make such conveyance of the said negroes and money and notes, as would, in the opinion of the said Abner and Mark Prewett, vest the said property in them." The bill then proceeds to charge, that in virtue of these false and fraudulent representations, the defendants obtained possession of the slaves, notes and money of the intestate. That they have continued to hold the same ever since, and have contributed nothing to the support of the said widow and infant child, or to the payment of the debts, if any, of the intestate. The demurrer admits the truth of the allegations, as they are made in the bill. The defendants then admit by their demurrer, that during the last sickness of the intestate, and while generally debilitated in body and mind, they falsely represented to him that he was indorser for one Crane, when the truth was otherwise ; and taking advantage of his situation, induced him to place his property in their possession, with the assurance that they would employ it for the support and benefit of his widow and infant child. The proposition established by these several allegations, is, that although the act of Cherry may appear to be fraudulent, yet he was induced by the false assertions and fraudulent conduct of the defendants to enter into the arrangement. The question is, would the intestate, but for these false statements, and fraudulent conduct of the defendants, have made the disposition which it is alleged was made, of his property ? The inference is very clear, that no such disposition would have been made. If therefore, the defendants were allowed at this late day to assign new causes of demurrer, this could not avail them. Assuming the allegations of the bill to be true, the defendants are accountable as trustees for the property and money, which it is alleged they received.

The point on the demurrer having been disposed of, a question of fact alone was presented for the consideration of the court below. The case presenting a great variety of circumstances, as well as perhaps some conflict in the testimony, the chancellor directed

an issue to be made up and sent to a jury for trial, in the Circuit Court of Monroe county. The jury, after hearing the evidence, found a verdict in favor of Abner Prewett, and a verdict against Mark Prewett, for the sum of $4918, which being certified to the Vice Chancery Court, a decree was rendered thereon for the complainant, from which decree the present appeal has been prosecuted.

The first question at this stage of the case coming up for consideration is, whether the decree of the chancellor is sustained by the testimony in the cause; and this must depend upon the fact, whether the verdict of the jury was warranted by the evidence; by which is meant, not whether it was clearly right, but was it manifestly wrong? The evidence consists mainly of the admissions of the defendant, which appear to have been but few, though he was frequently approached on the subject. To one witness he admitted, that he had the means of the infant son, amounting to about $1500; to another he made the same admission, except as to the amount, which he stated to be $2000, or 2500. To others, admissions were made, which, though not certain as to any particular sum, or duty which be intended to perform for the infant, yet enough appears to have been said to awaken suspicion. Admitting that the evidence is not as certain and direct as it is desired evidence should be, yet having been weighed and considered by a jury, supposed always to be conversant with the common transactions of life, and the motives which influence human action, and been by them pronounced sufficient, their verdict must stand, unless a clear preponderance in the evidence is shown the other way. We are not prepared to say that such is the case. Twelve minds, perhaps differently constituted, viewing the evidence in different lights, have concurred in pronouncing, that, considered as a whole, the evidence establishes the main fact put in issue by the pleadings.

But it is said that there is no admission, that the defendant had in his possession any of the money or other effects of Cherry's estate, and that therefore there was no evidence which would be sufficient to sustain the allegations of the bill. It is true, the admissions refer in direct language to the means of the infant son;

Prewett v. Coopwood.

but if the jury credit the evidence, there is enough to show that the means constituted part of Cherry's estate, and ought to be accounted for to the representative, and not merely to one of the distributees. Besides, such is not the position taken by his answer. If he intended it as a full and fair denial, he denies having received any of the money or other means of the estate, as charged in the bill. The bill charges, that he received what he obtained, for the widow and infant son. He denies—at least attempts to do so—this allegation. He is therefore estopped by his answer, to say that he is accountable, if at all, not to the representative, but to the infant son. When he said that he had the son's money or means, he must be understood as merely saying, that he intended to account to the son for what he had received of the intestate's estate.

It is again said by counsel, that but little weight ought to be given to the evidence, as it consists entirely of the admissions of the party. It has been frequently said, that such evidence may be either the weakest or strongest, when considered with due regard to all the surrounding circumstances. We assent fully to this rule; the value of every admission, as evidence, must depend more or less upon the circumstances under which it was made. It may be worth nothing, or irresistible, according to the situation of the parties, or the circumstances attending it. These matters must, however, be considered, like the admission itself, by the jury. The court must decide whether testimony is competent to go to the jury, and they must determine the weight to be given to it; and of course in considering this question, they must consider all the circumstances under which it was made.

The last point made by counsel is, that the court erred in ruling out certain evidence offered by the defendant. It appears that the widow of Cherry, about 1840 or 1841, stated to the witness, that her father, Lemuel Prewitt, had her money, (meaning her interest in the estate,) in his hands. The object of the evidence was to create the presumption that the defendant had not received so much of the estate, at least, as belonged to the widow. If she had been the only distributee, and the estate owing no debts, as is proved in this case, the evidence would have been admissible

on the ground, that being the sole beneficiary in the estate, she could make admissions or do any other act affecting her interest, which a legal owner of property could make or do.    That she could make no admission affecting the rights of a co-distributee, because she had no power over his interest.    The money, when collected, must be distributed under the authority of the Probate Court; and her admissions ought not to be received to diminish the recovery, when she will share equally with an innocent party the amount recovered.    Under this view of the law, the evidence was properly ruled out.

Decree affirmed.