## LEWIS A. DRAKE *v.* JACOB SURGET.

1. NEW TRIAL: NOT GRANTED FOR IMMATERIAL ERROR.—A new trial will not be granted for an error of the court, which could not have prejudiced the party asking it; and hence, the erroneous exclusion of competent evidence will be no ground for setting aside the verdict, if the fact which the evidence tended to prove was fully established by the other proof in the cause.

Drake v. Surget.

2. NEW TRIAL: INSTRUCTIONS WHEN NOT OPEN FOR REVIEW ON MOTION FOR NEW TRIAL: HIGH COURT: EXCEPTIONS.—Instructions which were neither excepted to on the trial, nor marked by the clerk as " given" or "refused," cannot be objected to for the first time on a motion for a new trial, and they will not be reviewed by this court in determining the propriety of the judgment of the court below, on the motion for a new trial. See *Anderson* v. *Hill*, 12 S. & M. 682; *Field* v. *Wear*, 28 Miss. R. 67–68; *Mayer & Co.* v. *McLure, ante.*

3. NEW TRIAL: RULE AS TO GRANTING: WHEN THERE IS NO ERROR IN THE RULINGS OF THE COURT.—This court will not award a new trial, when there is no error in the rulings of the court below, unless the evidence greatly preponderate against the verdict, or the verdict be without evidence, or appear to be manifestly wrong from the record before the court.

4. PLEADING: EVIDENCE: ALLEGATA AND PROBATA MUST AGREE.—When the plaintiff declares on a special agreement, he is bound to prove the contract as laid in his declaration, or else he cannot recover.

5. SAME: SAME: VARIANCE.—When the plaintiff declares on a special agreement, and also files the common counts, if at the trial he proves a special agreement, but materially different from that laid in his declaration, he cannot recover on any of the counts. He cannot recover on the special counts, because of the variance; nor can he recover on the common counts, because a special agreement has been proven. See 2 Tuck. Com. 148; 1 Str. 648; Bull. N. P. 139; 6 Term. R. 325.

6. SAME: SAME.—In actions upon contract, if any part of the contract proved should vary materially from that which is stated in the declaration, it will be fatal,—for a contract is an entire thing, and indivisible.

7. SAME: SAME: CONSIDERATION MUST BE PROVED AS LAID.—In a declaration upon a special agreement, the entire consideration must be stated, and the entire act to be done in virtue of such consideration, together with the time, manner, and circumstances; the consideration is descriptive and material, and must, with all the other parts of the agreement, be strictly proved as laid. See 1 Greenl. Ev. §§ 58, 66, 67, 68. Handy, J., dissented.

8. SAME: SAME: CASE IN JUDGMENT.—If in a declaration against a warehouseman, to recover the value of goods stored with him and destroyed by fire, it be averred that the defendant received the goods on storage, "for a certain reasonable reward to be paid to him by the plaintiff," and the proof shows that the defendant was to receive a stipulated price, the variance is fatal. Handy, J., dissented. So if the declaration aver that the goods were to remain in the custody of the defendant, until they were ordered to be shipped by the plaintiff, and the proof shows that there was no agreement as to the time during which they were to be in defendant's custody, the variance would be fatal.

9. SAME: SAME.—In an action against a warehouseman to recover the value of goods stored with him and destroyed by fire, it is immaterial what amount of compensation he is entitled to receive, or whether it was stipulated between the parties. It is sufficient if he was entitled to receive compensation for the service; and hence, if the declaration aver that he was to receive a reasonable

Drake v. Surget.

reward, and the proof shows that the price was agreed on by the parties, the variance will be immaterial. See 1 Chit. Pl. (8 Am. edit.) 296; Handy, J., dissenting.

10. PRACTICE: OBJECTIONS TO EVIDENCE ON ACCOUNT OF VARIANCE.—After verdict, it is too late to object, that the consideration of the agreement sued on, is not proven as laid in the declaration, if the evidence show a sufficient consideration.

ERROR to the Circuit Court of Jefferson county. Hon. Stanhope Posey, judge.

The declaration contained six counts. The first count alleged, that the defendant, being engaged in the storage and forwarding business, in the town of Rodney, on the 1st day of September, A.D. 1854, "in consideration that the said plaintiff, at the special instance and request of the said defendant, would deliver to the said defendant, certain cotton of him the said plaintiff, to be by him the said defendant safely and securely kept and stored in the brick shed or warehouse of the said defendant, in the said town of Rodney, until the said plaintiff should order the same to be shipped, for reasonable storage and reward, to him the said defendant in that behalf to be paid, by the said plaintiff, he the said defendant undertook; and there and then promised the said plaintiff, that he would safely and securely keep and store the said cotton, so to be delivered to him, in his said brick shed or warehouse, until he the said plaintiff should order the same to be shipped." The declaration then alleges, that the plaintiff did deliver one hundred and fifteen bales of cotton to defendant, worth seven thousand dollars, in pursuance of said agreement, which he received, to be stored as aforesaid.

The breach of the contract assigned is, that the defendant did not store and safely keep said cotton in his brick warehouse, until plaintiff ordered the same to be shipped, but on the contrary, without any orders for shipment, and without plaintiff's knowledge and consent, and against his wishes, he stored the said cotton in a wooden shed, whereby said cotton, on the 6th day of April, 1855, was destroyed by fire, and wholly lost to plaintiff, to his damage seven thousand dollars.

The second count is in substance the same as the first, except

that the special agreement to store in the brick-house, is stated to have been made on the 1st day of January, 1855, and after the delivery of the cotton by plaintiff to defendant.

The third count alleges, that on the 1st day of January, 1855, in consideration that the said plaintiff, at the special instance and request of the said defendant, had caused to be delivered to the said defendant, one hundred and fifteen other bales of cotton, belonging to the plaintiff, and of the value of seven thousand dollars, to be by him safely and securely kept for the said plaintiff, for a certain reasonable reward, to be paid by the plaintiff to him therefor, he the said defendant promised that he would safely and securely keep the same.

The breach assigned is, that the defendant conducted himself so carelessly and negligently in that behalf, that the said cotton was, on the 6th of April, 1855, destroyed by fire, to plaintiff's damage seven thousand dollars.

The fourth count is the same as the third, except that it avers, that the defendant " promised and undertook that he would safely and securely keep the said one hundred and fifteen bales of cotton for the said plaintiff, and redeliver them to the plaintiff, when the defendant should thereunto be requested; and that the plaintiff, on the 5th day of September, 1855, requested the defendant to deliver the said cotton, which he refused and neglected to do, and has always since and before that time refused and neglected to deliver the same.

The fifth count is for money had and received by defendant to plaintiff's use; and the sixth, is upon an account stated.

The defendant pleaded the general issue, and the cause was submitted to a jury, who found a verdict for the plaintiff for $4404 15½.

The defendant moved for a new trial, for the reasons stated in the opinion of the court, which was refused, and he excepted.

It is not necessary to state with particularity the evidence, or the amount of the cotton and its value, as the court expressed no opinion as to whether the damages were excessive; it is sufficient to state on this point, that the plaintiff proved the delivery to the defendant, of one hundred and fifteen bales of cotton, during the months of November and December, 1854.

The substance of the remaining evidence is as follows :—

*Evidence for plaintiff.*—T. C. Holmes testified that he was agent for plaintiff in 1854, and for several years previous, in relation to shipment of the cotton raised on his plantation in Jefferson county, known as the "Gravelly Ford," or "Ross" place, and to furnish supplies for that place ; that the crop of 1853 had been stored with Broughton, and had become damaged by the weather, and plaintiff was desirous to store the crop of 1854 where it would be more secure from injury by the weather, and from fire. That in June, 1854, or the early part of summer, witness, as agent for Surget, made a verbal contract with the defendant, Drake, to store the crop of that year in a brick shed or warehouse, which he, Drake, was then building. Drake had a wooden shed near the river, at Rodney, and he agreed to store the cotton in the wooden shed at ten cents per bale, or in the brick shed at twenty cents a bale. Witness made the contract with Drake to store the cotton in the brick shed, at twenty cents per bale. No time was limited as to when the cotton was to be shipped, but it was to remain in the brick shed until the plaintiff wanted to ship it. Surget generally held his cotton until late, say till March, and sometimes till May and June. The crop of 1853 was shipped about the last of May. The wooden shed of Drake's was burned on the 7th of April, 1855, and all the cotton of Surget destroyed in it. Witness never received any notice from Drake to ship the cotton, nor that he wanted the shed. Witness's brother, Richard, was never authorized to act for him in reference to Mr. Surget's business, though he sometimes acted for witness in the management of the steamboat Princess, of which witness was the commander. Plaintiff's cotton had never been stored with Drake, nor any of plaintiff's business done with him, until this contract for the storage of the cotton was made. There was no condition or limitation in the contract, as to the time the cotton was to remain in storage. Witness had no authority from Surget to agree to any limitation of the time the cotton was to remain in storage ; and had any limitation been required by Drake, witness would not have made the contract with him. Witness was agent of the plaintiff in his individual capacity, and not as captain

Drake v. Surget.

of the boat. No one was agent for witness in the transaction of plaintiff's business.

On cross-examination, witness stated that he had given his deposition in this cause in New Orleans, in which he had stated that the contract was made with Drake in the spring of 1854, and that there were about two hundred bales of Surget's cotton burned. He did not know positively, but supposed there was about the usual crop of two hundred, and so stated in the deposition. Witness is satisfied the contract with Drake was made the last of the spring, or early in the summer of 1854. Witness does not recollect anything being said about how long the cotton was to remain in store, nor about the brick shed being wanted by Drake for the pork season, because nothing of the kind was said; nor about Drake furnishing supplies for the place; nothing except that Drake was to store the cotton, and receive and ship the supplies. The clerk of the boat was authorized to purchase supplies whenever wanted. The contract with Drake was made on the boiler deck of the Princess, at the landing at Rodney; it was all done in three minutes. Does not recollect that anybody was present, but there were various persons standing round.

And being re-examined by plaintiff, he said he would not have made the contract for storage with Drake, if the cotton had been subject to removal from the brick shed; does not know that Drake's shed was fireproof; it was built of brick and covered with slate. Thinks the shed was in process of erection at the time the contract was made, but is not positive.

Plaintiff read the following letter, in the handwriting of defendant:

"RODNEY, April 7, 1855.

"CAPT. HOLMES. Dear Sir: My cotton shed was burnt up last night, with all Mr. Surget's cotton. The work of an incendiary.
"Your obedient servants, L. H. DRAKE & Co."

James Shaw testified that he was overseer on the place in 1854. The crop was one hundred and fifteen bales, averaging one hundred and thirty-two bales at four hundred pounds per bale. It was hauled to Drake at Rodney. Drake told witness it was stored in

the brick shed, and afterwards removed to the wooden shed, where it was burned.

James E. Broughton testified that Surget's crop of 1853, was stored with witness at Rodney, and was shipped June 3, 1854. It was then discovered to be damaged by the weather, and Capt. Holmes changed the storage to Drake's shed for greater security, and plaintiff's business was changed to Drake as soon as it ceased with witness. Plaintiff had stored with witness for several years, up to the time the business was transferred to Drake. Drake's brick shed is all open in front.

On cross-examination, says: His shed was up in the town of Rodney, adjoining Sharpe's livery stable. Drake's shed, where the cotton was burnt, was down near the river, about fifty yards from the river at high water, and considerably further at low water, and about a quarter of a mile from any place where fire was kept. Drake's brick shed is exposed to fire in front, being about thirty feet from frame houses. The shed on the river was much the safest from accidental fire.

And being re-examined, he says: Wagoners sometimes camp near the shed on the river, and build fires at night. Care is always taken to prevent fire in the yards, but it will sometimes happen. Plaintiff did not ship his cotton till late in the spring or early in the summer, which witness believes was known to Drake. Cotton could be insured in witness's shed, not at a very high rate, but much lower in Drake's brick shed. The top and sides of it were fireproof, but it was open in front, with frame buildings within thirty feet. Witness paid damages for the injury to the cotton in 1854.

*Defendant's evidence.*—The defendant read the deposition of Osmond E. Rice, who testified that he knows the plaintiff's cotton was stored with defendant in the fall of 1854. Witness received and stored it, and thinks there were one hundred and fifteen or one hundred and twenty bales. It was received from the last of October to the last of December, 1854, and was stored in a brick shed or warehouse in the rear of defendant's store in Rodney, by a verbal agreement between defendant and T. C. Holmes, agent for the plaintiff.

The defendant offered to store the plaintiff's cotton in the brick

shed at twenty cents per bale, or in his frame shed on the bank of the river at ten cents. The defendant said if stored in the brick shed or warehouse, he could not store it longer than the last of February or the first of March, as he must have the warehouse at that time to store pork in. The verbal agreement was made with Captain Holmes, about the middle of October, 1854, at the steamboat landing at Rodney.

As Captain T. C. Holmes passed up to Vicksburg, about the middle of October, 1854, he left word with Tobias Purcell and witness, to request Mr. Drake to come on board of the boat, as he wished to see him on business with regard to receiving and storing Jacob Surget's cotton and plantation supplies, which message was delivered to Drake. He replied, if convenient, he would see the captain on his return. Drake instructed Purcell and witness what to say to Captain Holmes in case he did not see him. Purcell was acting as bookkeeper for Drake, and agent for the Princess, which boat Holmes commanded, and witness was acting as shipping and receiving clerk for Drake. On return of the boat, witness went on board to attend to some business in the office; not seeing Captain Holmes, he went to look for him, and found him and Drake standing on the forward part of the boat. As witness approached them, he heard Drake say to Holmes that he would store the cotton in the brick shed at twenty cents per bale, and drayage to the landing when shipped, or in the frame shed at ten cents a bale. Drake asked Holmes how long he intended holding the cotton. He replied, " Until the crop all came in." Drake then said, if he was going to hold the cotton as long as usual, he would not store it in the brick warehouse, as he must have it to store pork in by the 1st of March. Holmes said he wished it stored in the brick shed, and he would ship it as soon as it all came in, or by that time at least. Drake asked Holmes if he should furnish any supplies for the plantation? Holmes replied, "No," that he would furnish anything that was necessary for the place.

Not seeing Captain Holmes in the office, witness went to look for him, to tell him on what terms Drake would store the cotton, and found them in the fore part of the boat, as stated. Is confident he heard all the conversation on the subject of the cotton, as Drake

had just come on board from his residence—thinks, in company with David S. Servis.

After defendant commenced receiving the cotton, Richard Holmes, who was acting in place of his brother, T. C. Holmes, requested witness to let him know when the crop all came in, as they wished to make arrangements for shipping it when the last was received. Drake requested witness to tell Richard Holmes the crop was all in, and he wished to have it shipped out of his way as soon as possible.

Defendant also read the deposition of Tobias Purcell, taken at Springfield, Illinois, July 28, 1856. He testifies that he was in the employ of L. H. Drake, in 1854, and of L. H. Drake & Co. in the early part of 1855, as bookkeeper and confidential clerk. He knows there was a conversation, in 1854, between Holmes, on the part of the plaintiff, and Drake, in reference to storing cotton, and the transaction of the business of the plantation of plaintiff in Jefferson county, such as receiving and forwarding the goods. Witness also acted as agent of the Princess, which boat Holmes commanded. On his up trip, about the last of September or first of October, 1854, Captain Holmes requested witness to ask Drake to come on board, as he wished to make an arrangement with Drake to take charge of plaintiff's business, which message witness delivered. *Drake replied, in case it was not convenient for him to go on board, to tell Captain Holmes that he would store the cotton in his brick shed at twenty cents a bale, or in the frame shed on the bank of the river at ten cents a bale; but if stored in the brick shed, he could not spare the room after the pork season commenced, which is usually in February or March. On the return of the boat, Mr. Drake went on board, and witness understood the same arrangement was made verbally, as Mr. Drake requested him to make, in reference to the cotton. He was not present, and did not hear the conversation.*

The witness further testified: that the cotton was stored in the brick shed. The whole crop was received about the last of December, 1854. On the 1st January, 1855, Drake formed a partnership with W. Stewart, and rented to the firm of L. H. Drake & Co. the store and warehouse containing the cotton. Shortly afterwards, Drake requested witness to notify Captain Holmes to ship

the cotton, as it was very much in the way; if he did not, he would have to remove it to the frame shed—which message witness delivered to Captain Holmes's brother Richard, acting in his place; and again delivered the same message to Captain Holmes, on his return from the North. In reply to which, Captain Holmes said he would ship the cotton as soon as he could see the plaintiff and get a vessel.

After this deposition was read, the plaintiff moved to exclude from the jury, all that portion of the testimony of Purcell printed in italics: 1st, because it did not appear that the message had been communicated to Captain Holmes; and 2d, because the latter portion of it was made on information derived from others. This motion the court sustained, and the defendant excepted.

David S. Servis testified, that about the 15th of October, 1854, he went with defendant from defendant's house in Rodney, on board of Captain Holmes's boat, at the landing. Witness lives about twelve miles from Rodney. He had been absent at the North in the summer, and had arrived at home, on his return, on the 8th of October, and this was on his first visit to Rodney after his return. The steamer Princess had been burned a few days before, and he thinks it was the McRae that Captain Holmes was then running. Witness and Drake met Captain Holmes on the boiler deck. Heard Holmes tell Drake that he wanted him to store Surget's cotton, as it had been damaged the season previous in Broughton's shed. Heard defendant say in reply, that he would store it in his brick shed at twenty cents a bale, or in his frame shed at ten cents. Witness then turned away, and did not hear the rest of the conversation. Witness knows O. E. Rice. He was defendant's shipping clerk, and was on the boat that night; but witness does not know whether Rice heard the conversation, nor remember whether he was present at it.

David Shroeder testified, that there was rain the day before Drake's shed was burnt. Witness built the brick shed for Drake. It was commenced in August, 1853, and finished by the last of September, 1853. It has been used by Drake chiefly for storing pork; he dealt largely in that article. The pork season commenced in February, and Drake usually had his shed full by the first of March.

And on cross-examination said, he also built Drake's frame shed. The roof was sound, and did not leak. There was in the shed, at the time it was burned, besides the cotton, some lumber and lime.

The defendant having rested, plaintiff recalled T. C. Holmes, who testified, that he went to Washington City in January, 1855, and with that exception, had not been absent from his business for eighteen years. That he frequently missed trips on his boat, when his brother Richard took charge of her, and attended to his business for him as captain. The Princess was burned on the 8th of October. Witness could not at first fix the year, but, on reflection, he knows it was the October before he went to Washington, and, therefore, was in October, 1854.

The court gave the following instructions for plaintiff:—

1. If the jury believe from the evidence that a contract was made between the agent of the plaintiff and the defendant, by which the defendant, for a valuable consideration, agreed to store the cotton of the plaintiff in a brick warehouse until the plaintiff should order it shipped, and if they further believe from the evidence, that in pursuance of such contract, the plaintiff did store one hundred and fifteen bales of cotton with the defendant; then, if they believe from the evidence, that the defendant, without the knowledge or consent of the plaintiff, removed the said cotton from the brick warehouse, and that in consequence of such removal, said cotton was destroyed, then the plaintiff is entitled to recover from the defendant the value of the cotton so destroyed.

2. If the jury believe from the evidence, that a contract was entered into between the agent of the plaintiff and the defendant, for the storage in his brick warehouse of one hundred and fifteen bales of cotton, and that by said contract no time was stipulated for the removal of said cotton by the plaintiff; then, if they believe from the evidence that said one hundred and fifteen bales of cotton were stored by the plaintiff with the defendant, and that the defendant subsequently removed said cotton from said brick warehouse without the knowledge or assent of the plaintiff, and that, in consequence of such removal, said cotton was destroyed, then the plaintiff is entitled to recover from the defendant the value of the cotton destroyed.

3. If the jury believe from the evidence, that the contract be-

tween plaintiff and defendant, for the storage of plaintiff's cotton, was for an indefinite period of time, then, if said cotton was removed by the defendant without notice to the plaintiff, or without the consent of plaintiff, and the cotton was lost in consequence of such removal, the plaintiff is entitled to recover from the defendant the value of the cotton so lost.

The following instructions were given for defendant:—

1. If the jury believe from the evidence, that by the terms of the contract, the defendant only agreed to store the plaintiff's cotton in his brick shed or warehouse until the commencement of the pork season, in February or 1st of March, then his removal of the cotton after that time to another place of storage, was not a violation of the contract, and the jury should find for the defendant.

2. If the jury believe from the evidence, that a contract for the storage of plaintiff's cotton was made by Captain Holmes with the defendant, in June, 1854, and that another contract on the same subject was made subsequently, about the middle of October, then the latter contract superseded the former, so far as it varied from the former, or contained additional or different conditions.

No exception was taken or objection made to the instructions when they were given, nor were they marked by the clerk as "given."

*G. H. Wilcox* and *H. T. Ellett*, for plaintiff in error.

Surget brought this suit against Drake, to recover the value of one hundred and fifteen bales of cotton, stored with Drake, and destroyed by fire. It was not denied that the cotton was stored; and the further facts that it was burned, and that the fire was the act of an incendiary, were proved by the plaintiff below, by the letter of the defendant, which the plaintiff gave in evidence.

It was not pretended on the trial that Drake was liable for the loss on the ground of negligence as a warehouseman, though the declaration contains counts charging him in that character. As a warehouseman, he was only bound for "reasonable and common care," "such as men in general exert in regard to their own concerns;" and he is not liable for losses, by fire or otherwise, "unless he has been guilty of ordinary negligence," which is defined to be

the "want of ordinary diligence." Story on Bailments, §§ 11, 17, 444, 446, pp. 8, 12, 290, and 291.

There is no suggestion or proof of any want of care in the storage or handling of the cotton. It appears that the wooden shed was one built and kept expressly for the storage of cotton, and was well adapted to the purpose, and that it was much safer from accidental fire than the brick one.

But the defendant below was sought to be charged for a violation of a special contract, to the effect that he should store the cotton raised by Surget, on his Gravelly Ford plantation, in 1854, in his brick shed, until such time as Surget should choose to ship it; which special contract it is alleged that Drake violated, by removing the cotton to another shed, in which it was destroyed by fire.

We contend that the proof in the cause wholly fails to establish such a contract, and that the verdict was flagrantly contrary to the evidence.

The burden of proof was on the plaintiff. "The party who alleges the affirmative of any proposition, shall prove it." 1 Starkie's Ev. 376. "*Probatio incumbit ei qui allegat.*" Dig. Lib. 22, tit. Probat; *Calder* v. *Rutherford*, 7 Eng. Com. Law Rep. 447. And surely nothing less than the testimony of one credible witness can be considered as proof, under the rule above cited. The only evidence of the special contract given by the plaintiff, was the testimony of Holmes. He was clearly contradicted, in whole or in part, by Rice, Purcell, and Servis; by Rice as to the tenor of the contract, and by Purcell and Servis as to its attendant circumstances and its date.

Holmes swears unequivocally to the contract as contended for by plaintiff, although not, as we shall presently show, as declared on. This witness swears that there was no limitation, as to the time that the cotton was to remain in the brick shed, but that it was to remain there until the plaintiff was ready to ship it.

Rice, on the other hand (an eye and ear witness, as we shall presently show, of the contract), swears to a material limitation, as to time,—the very point on which the whole stress of the case lies. He says, in detailing the terms of the contract made in his presence, "Defendant said if he stored it [the cotton] in the brick

shed, he could not store it there longer than the last of February, as he must have that shed by that time to store pork in."

Here, then, is a direct contradiction of the testimony of the plaintiff's only witness to the contract, to a most material part of the contract; so, the *onus probandi* resting upon the plaintiff, his case wholly fails, if the witnesses are equally credible, and had equal knowledge of the facts to which they testify.

Of their credibility we will speak presently. Let us here inquire: Did they have equal knowledge of the facts to which they testify? Did Rice hear the whole contract made by Drake and Holmes, the latter acting as agent for Surget?

The testimony of Rice, coupled with the statements of Servis, Purcell, and of Holmes himself, leave no doubt that the entire contract was made in the presence of Rice. He says he is confident he heard all the conversation on the subject, as Drake *had just come on board the boat*, where the contract was made, in company, as he thinks, with David S. Servis. Servis says he went from the house of defendant, with him, on board the boat; that witness and defendant met Holmes on the boiler deck. Witness heard Holmes tell defendant he wanted him to store plaintiff's cotton, as it had been damaged the previous year in Broughton's shed. He heard Drake reply that he would store it in the brick shed at twenty cents per bale, and in the frame shed at ten cents. At this point, witness turned away, and heard no more. Holmes says, the contract was made " on the boiler deck," and that " it was all done in three minutes."

Servis proves no contract, but he fixes the terms of the conversation between Drake and Holmes, to the instant that Rice came up to the parties who were contracting. Servis went on board the boat with Drake, and accompanied him into the presence of Holmes. Rice, on being asked to state particulars, says that Captain Holmes, on his up trip, left word with witness and Purcell to request defendant to come on board the boat, on her return, as he (Holmes) wished to see him about storing Surget's cotton; that, on the return of the boat, witness went on board, on business in the office; and not seeing Holmes, he went to look for him, and found him, *with Drake, standing on the forward part of the boat;* that, as he approached, he heard Drake say he would store the cotton in the brick shed, at

twenty cents per bale, and in the frame shed at ten cents. This being, as Servis testifies, the reply of Drake to the first remark of Holmes, about storing cotton, the conclusion is irresistible, that Rice came up to the parties at the commencement of their contract, and in time to hear the whole of it. It occupied but a few moments,—"three minutes," according to Holmes. Servis says he knows Rice was on board the boat; but it being after dark, neither is able to speak of the presence of the other at the conversation.

The fact then being established, that Rice heard the whole contract, what is his version of it? He says that, after the conversation already cited, about the price, per bale, of storage, defendant asked Holmes how long he intended holding the cotton, and that Holmes replied, "Until the whole crop came in." Defendant then said, "if he (Holmes) was going to hold the cotton as long as usual, he (Drake) could not store it in the brick warehouse, as he must have it to store pork in by the 1st of March." Holmes replied, that he wished it stored in the brick shed, and he would ship it as soon as the crop came in, or by that time (1st of March) at least. Holmes was further asked by Drake, if he (Drake) should furnish the supplies for the Gravelly Ford plantation, to which Holmes replied "No," that he would furnish what was necessary.

These details, ample to fill up the space of time fixed by Holmes, —"three minutes,"— are not only conclusive of Rice's full knowledge of all the terms of the contract, but they completely overthrow the idea of such a special contract as Holmes testifies to,—a contract confining the cotton to the brick shed, and for an unlimited time.

Holmes and Rice stand equally credible, *per se*. No attempt was made on the trial to impeach the character of either. Let us inquire,

I. Who is best sustained by the other witnesses? and

II. Whose story is intrinsically most credible?

*First.* Rice is directly and indirectly sustained by the testimony of Servis and Purcell.

We have already seen that Servis confirms Rice in relation to the circumstances, *and the words used by the parties*, in the beginning of the contract; in fact, so long as Servis heard the conversation. We shall show, in another connection, that Servis confirms

Rice and contradicts Holmes, about the *date* of the contract. Purcell testifies that Holmes, on his up trip, left word with him for Drake to come on board, on return of the boat, as he wished to see him about the storage of Surget's cotton; that witness delivered the message to defendant, and was instructed by him to say to Captain Holmes (in the event that defendant could not go on board), that he would "store the cotton in the brick shed at twenty cents per bale, or in the frame shed at ten cents per bale; but if in the brick shed, he could not spare the room after the pork season had commenced." It seems that the contract was to have been made through Purcell, but that Drake, in consequence of the accidental presence of Mr. Servis in town, and the latter's desire to go on board the boat, accompanied Servis, and made the bargain, in person, with Holmes.

This part of the testimony of Purcell, after it, and Purcell's whole deposition, had been read in evidence without objection, was, on motion of plaintiff, ruled out by the court, because it did not appear that the message was ever delivered to Holmes.

This brief review of the testimony shows conclusively, we think, that Rice is fully corroborated, so far as corroboration is possible under the circumstances, by Servis and Purcell; and that Holmes is contradicted, to a like extent, by the same witnesses.

*Second.* Whose story is intrinsically most credible?

Holmes testifies to a contract that hardly any amount of proof would be sufficient to establish. The contract he swears to is neither more nor less than this: that Drake, for the pitiful consideration of twenty-odd dollars (the price of the storage of one hundred and fifteen bales of cotton), consented to abandon his large and lucrative trade in pork for an unlimited time, and to give Surget perpetual control of his brick warehouse.

It appears from the evidence, that Drake was a large dealer in pork; that he used his brick shed chiefly for storing that article; that the pork season commenced in February, and that he usually had his shed full by the 1st of March.

Rice's testimony on this point is intrinsically credible. The contract he proves is in accordance with the manifest interest of Drake. It is just such a contract as Drake had determined to enter into, when he gave directions for making it through Purcell.

In fact it is the only one that a sane or sensible man would have made, under the circumstances. And unreasonable as the contract, as represented by Holmes, is, in its nature and character, it is perhaps quite as improbable and extraordinary that any contract at all should be entered into in June for the storage of a crop of cotton not to be delivered until November.

But we are not at all driven to rely upon the intrinsic credibility of Rice's story, and the incredibility of Holmes's, strong as that point is. *The conduct of all parties, after the contract was made,* shows that they understood it to be as Rice testifies that it was, to wit, that the cotton was to be removed as soon as the crop was all in, or by the 1st of March.

Purcell states that the crop was all in, and stored in the brick shed, by about the last of December, 1854; that the defendant instructed witness, in January, to notify Captain Holmes to ship the cotton, as it was very much in defendant's way, and that if it was not shipped, defendant would have to remove the cotton to the frame shed; that witness delivered this message to Richard Holmes, who was acting in place of Captain Holmes, *and to Captain Holmes himself,* on his return from the North. (Captain Holmes swears that he was in Washington City in January, 1855.) Purcell testifies that Captain Holmes replied that he would ship the cotton *as soon as he could see the plaintiff, and get a vessel.*

Now, what does this message assume? Clearly, that Drake understood the cotton to be removable when the crop was all in, or before the pork season commenced. And does not Captain Holmes's reply admit it? We think so.

Again: Rice testifies that Richard Holmes, who sometimes acted for his brother, Captain Holmes, desired witness to let him know when the cotton was all in, as they wished to make arrangements for shipping it, so soon as the last of the crop was received. Does not this imply that Richard Holmes understood the contract as Rice represents it?

It is true, Captain Holmes states that his brother Richard never acted for him in the agency of the Gravelly Ford plantation; but in this he is manifestly mistaken. Who attended to this business when Captain Holmes was in Washington City? Purcell and Rice both speak of Richard Holmes as sending or receiving messages in

relation to this business, in the absence of his brother. At all events, the inquiry of Richard Holmes, and the reply of Captain Holmes to the message delivered by Purcell, indicate that they understood the contract alike, and that they *then* understood it in the same light that Rice did, and the same that Drake contends for.

The manifest inaccuracies of Holmes's testimony are sufficient to invalidate his credibility, when clearly contradicted by an unimpeached witness, against whom no such inaccuracies can be urged. He testified on the trial, that the contract was made "in June, 1854, or the early part of summer;" and, on cross-examination, he admitted that he had given a deposition in the cause, in which he had testified that it was made "in the spring of 1854." This date, about which he thus vacillates, is really a vital question in the cause; for if the contract was made, not in the spring, or in June, or early summer, but about the middle of October, as the defendant's witnesses testified, then the testimony of Holmes is utterly destroyed, and neither the accuracy of his memory, nor his credibility, can be set up as comparable to that of the witnesses on the other side. Purcell, Rice, and Servis, all testify that the contract under which the cotton was stored, was made about the middle of October. Servis, a gentleman of high character and social position, gives reasons for his opinion, which fix the time beyond the possibility of question. He was not at home at the time Holmes fixes as the date of the contract, but was absent at the North. He returned to his home, about twelve miles from Rodney, on the 8th of October; and his first visit to Rodney, after his return, was about the 15th, on which occasion he accompanied Drake on board the boat, and heard the commencement of the conversation with Holmes. This would itself be conclusive; but this witness goes on to render assurance doubly sure. He mentions another important fact, to wit, that the steamer Princess had been burned a few days before, and that this conversation occurred on the boiler deck of the McRae, which boat Captain Holmes was then running in the place of the Princess. After the evidence for defendant was closed, the plaintiff again placed Holmes on the stand, and, notwithstanding the fullest opportunity, he did not venture to contradict or correct the statement of Servis, as to their meeting on the night in question, nor as to the name of the boat on which the contract was made, nor in any

other particular; but on the contrary, admitted it to be true that the Princess had been burned on the 8th of October, 1854.

And here another instance of the utter unreliability of Captain Holmes's memory was manifested; for he professed to be unable to tell the year in which his splendid boat, in which his affections and his·fortunes were equally bound up, was destroyed, until after long reflection; and then was only able to determine it by reference to a pleasure trip to Washington, which he was able to say was in January, 1855.

Holmes also testified that Drake was " building" the brick shed at the time the contract for storage was made; whereas Shroeder shows that the shed was finished and occupied in September, 1853.

He testifies that the cotton was burned on the 7th of April, 1855, while the letter of Drake, given in evidence by the plaintiff, shows that the fire occurred on the night of the 6th of the same month. He swears that the " cotton was all burned;" a fact of which he could have had no personal knowledge.  He admits that in a deposition taken in the case, he had deposed that the cotton amounted to about two hundred bales (instead of one hundred and fifteen bales, according to the fact), and excuses himself for the wide discrepancy, by the allegation,,that when he gave his deposition, he based his statement of quantity, upon the supposition that the crop of the place was about an average one; a very loose way, certainly, of compelling Drake to pay for eighty-five bales of cotton that he never received.

No question can arise about the relative credibility of Holmes on the one hand, and Rice and Purcell on the other, founded upon their bearing and manner upon the stand; for the testimony of the latter was given by depositions, taken on the most general and unexceptionable interrogatories.  And it is to be remarked, too, that one of them gave his testimony at Springfield, Illinois, and the other at Fort Smith, Arkansas, at such a distance as to preclude all possibility of concert or collusion between them.  The contrast in the situations of these witnesses is all in favor of the greater credibility of Purcell and Rice.  They, so far as appears, have no connection with Drake; they have had no agency in the contract, and can be brought under no censure, whatever may be the result of the suit.  Holmes, on the contrary, was acting in a lucrative and re-

sponsible fiduciary capacity, and is interested in showing that he made a wise contract with Drake, and such a one as will hold the latter responsible for the cotton destroyed.

We think it has thus been clearly demonstrated that, regarded as a question of conflicting testimony, there was not sufficient evidence for the plaintiff, to sustain the verdict, and that the verdict was clearly wrong.

It is no doubt true that the jury are the judges of the credit due to testimony. But they have no arbitrary discretion; they must give credit where it is lawfully due; and if the law adjudge that certain facts render a witness unworthy of credit, the jury cannot rightfully give credit to his testimony, or found a verdict upon it. *Dunlop* v. *Patterson*, 5 Cowen, 246.

In that case the court remarked, that "the unsupported testimony of a single witness, who swore at one time in direct contradiction to the testimony given by him at another, in relation to the same transaction, was not entitled to credit, and ought not to be regarded."

And while, when a witness is unimpeached, and the facts sworn to by him are uncontradicted by other witnesses, and there is no intrinsic improbability in his relation, the jury cannot disregard his testimony (*Newton* v. *Pope*, 1 Cowen, 109; Cow. & Hill Notes to Phil. Ev. Part 1, page 396); on the other hand, if the fact depend entirely upon the testimony of an uncorroborated witness, whose credibility is plainly impeached, the jury are equally bound to disregard his testimony. 5 Cowen, 243; Cow. & Hill Notes to Phil. Ev. Part 1, p. 396.

And when, in cases of conflicting witnesses, the judgment, after every exertion, is reduced to the necessity of deciding that on the one side or the other there has been intentional falsehood, and no satisfactory reasons occur for fixing the superiority of credit, the last resource is to obliterate wholly the conflicting testimony, and to determine upon the want of preponderance of proof, according to the rules which must have prevailed in the total absence of it. Ib. 421.

These are rules of law, to determine the credit due to testimony, and if they have been disregarded by the jury in this case, as they clearly were, it is the duty of the court to apply the corrective.

But there is another point of view in which the finding was as manifestly erroneous. It is always the duty of court and jury to reconcile the testimony, if possible, and so to decide the case, that all the evidence may be considered as true. Now in this case Holmes testified to a contract, made in May or June, on board the steamer Princess; Rice, Purcell, and Servis prove a contract made in the following October, on board the steamer McRae, after the Princess had been burned up. It may be that all the witnesses tell the truth, and relate facts that occurred. Holmes does not deny that such a contract was made on the McRae in October, but only speaks affirmatively of a contract made in June. Rice, Purcell, and Servis know nothing of any contract but that made in October. Now, if there was such a contract in October as Rice speaks of, it necessarily supersedes that of June preceding, so far as it differs from it; and it follows, therefore, that while a verdict for the plaintiff was substantially a conviction of Rice, Purcell, and Servis of perjury, a verdict for the defendant would have reconciled all the testimony, and imputed falsehood to none, as the proposition was put, in the second instruction given for the defendant.

Several errors remain to be noted, apart from the merits of the case as already discussed.

I. It was error to rule out that part of the testimony of Purcell which gives the answer made by Drake to the message sent by Holmes to him through the witness. This was ruled out, after it had been read, with the whole deposition, without objection, and on the ground, that the witness had not communicated it to Holmes. In the first place, the objection came too late. It was too late, after the evidence had gone to the jury, without exception, to object, and move for its exclusion. *Dick* v. *The State,* 30 Miss. R. 593, 599.

But the evidence was material, pertinent, and lawful. This witness did not hear the final agreement, but he was offered, to corroborate Rice, as far as his knowledge went.

The question in the cause was, whether the contract was made in June, as sworn to by Holmes, or in October, as proved by Rice. It was certainly competent to impeach the testimony of Holmes, by proving, by Purcell, who was the agent of Holmes for his boat, that about the last of September or October, Holmes requested witness

to ask Drake to come on board as he returned, as he (Holmes) wished to make an arrangement with him to take charge of Surget's business, and that he delivered that message. 'If so, then is it competent to prove what• Drake said to Holmes's messenger and agent, at the time when the message was delivered, in reply to that message, *without showing that it had been communicated to Holmes?* Whether the reply was communicated to Holmes or not, must depend upon the faithfulness of his own messenger. It was not shown that it was not communicated, and it is respectfully insisted that its admissibility as evidence, does not depend upon any such considerations.

The intervention of a third person, in such a case, can make no difference. It must be regarded as a conversation between Holmes and Drake,—the former acting as agent for Surget. If one part of a conversation is given in evidence, the whole must be given. If one part is evidence, the whole must be, though, in some cases, one part may not be entitled to the same weight as another part.

And though the statement ruled out was the answer of Drake himself, yet it is evidence for him, as a part of the *res gestæ.* The *res gesta* here, is the communication made to Drake by Holmes, through the witness; and the reply to the proposition made at the time, is a *part of the transaction.* It is not hearsay. It is not a *recital* of past affairs, but it is a fact in the transaction, and it derives its credit from its natural and necessary connection with the circumstances, independently of any credit due to the speaker. 1 Starkie Ev. 47, 48, 49; 1 Greenleaf, § 108.

Pothier says, the true distinction is between cases in which the immediate action of speech furnishes a material indication with respect to the object of inquiry, and those in which it is a mere act of narration. 2 Poth. Ob. 216, 247.

Here the *message* shows Holmes's understanding that no previous contract had been made; the reply, which was spontaneous and immediate, shows a like understanding on Drake's part, and also shows the terms on which alone he would make the contract. There was no time, opportunity, or motive to give a false or feigned answer; and the case is fully within those contained in the books, in which the admissions of a party are held as evidence in

his own favor, as "verbal acts, indicating a present purpose and intention."

We do not prétend that this reply would, of itself, *be evidence of the terms of a subsequent contract;* but it was clearly admissible to show that no contract had then been made, and also to corroborate the testimony of Rice as to what the contract was, when made.

It showed the *intention* of Drake, when he expected to make the contract by proxy, and was peculiarly pertinent when two witnesses, equally unimpeached by evidence as to credibility, testified to entirely opposite statements of the terms of the contract, as afterwards actually made. Rice testifies that the contract for storage was limited as to time; Holmes swears that it was not. Purcell shows how that contract was to have been made, if made by proxy, agreeably to the original intention,—thus raising a strong presumption that Rice is correct in his statement, in opposition to Holmes, of the terms of the contract as actually made.

It was also admissible, in corroboration of the testimony of Rice, that " Drake instructed him and Purcell what to say to Holmes, in case he (Drake) did not see him," and that " he went to look for Holmes, to tell him on what terms Drake would store the cotton," when he found Drake and Holmes together, and heard them make the agreement. This portion of Rice's testimony was not objected to. He, however, does not give what Drake instructed them to say. Purcell does not say that Drake instructed them what to say, but proceeds to give his reply in Drake's own language, which contains the evidence that he did instruct them what to say in answer to Holmes's message. As much depends upon the testimony of Rice, we claim the right to sustain and corroborate his evidence, even in regard to collateral facts, as to which he has been allowed to testify without objection.

II. Plaintiff's allegations and proofs do not correspond.

He declares upon a contract to store cotton for a reasonable storage and reward; he proves a contract for a specific price, to wit, twenty cents per bale.

III. The second and third charges given by the court, on behalf of the plaintiff, were erroneous.

They are, in substance, that if there was no express limitation of the time of storage, and the defendant ever removed it without the

Drake *v.* Surget.

plaintiff's knowledge or consent, and it was lost in consequence of such removal, the defendant would be liable.

These instructions assume, that if the cotton was received by defendant on storage, without limit as to time, he might be compelled to store it forever. Such, we contend, would not be the legal effect of such a contract; but, on the contrary, the defendant might, after a reasonable time, and upon reasonable notice given, compel the plaintiff to remove the cotton, or might do it for him.

Again: the instructions assume, that the actual knowledge, or the actual consent, of the plaintiff must be had, before the cotton could be lawfully removed. We contend that "knowledge" or "consent" of the plaintiff was immaterial. He was entitled to notice, after a reasonable time of storage, and a reasonable time after notice, in which to remove the cotton, and nothing more.

The assumptions of these instructions were peculiarly oppressive upon the defendant; because he proved clearly that he held the cotton stored in the brick shed a reasonable time, say from December (when the last of the crop came in) to the first of April; and that he gave amply reasonable notice, say in January, to Richard Holmes, and in February, to Captain Holmes, after his return from Washington City.

IV. If we admit that such a contract was made as alleged, we contend that the defendant was not liable under the circumstances proved. If Drake broke his contract, he was only liable for such damages as occurred in consequence of the breach. The loss in this case did not occur in consequence of a breach of contract, even if such a contract had been made as plaintiff contends for; but by the act of an incendiary, by a fire "wilfully kindled," for which a warehouseman is not liable. Story Bailm. § 449, p. 292.

There was no negligence or want of ordinary care in the removal of the cotton from the brick to the frame shed, so far as appears from the testimony. And a warehouseman is only liable for want of ordinary care. 26 Miss. Rep. 256; 14 Ala. Rep. 745. According to the proof, the frame shed was safest from accidental fires, being a quarter of a mile from any place where fire was kept; while the brick shed was open in front, and within thirty feet of wooden buildings. The brick shed was as accessible to an incendiary as the frame one, being "open in front." As the fire did not occur, and

the loss was not occasioned, by the act of Drake, or by his negligence, but by the act of an incendiary, against which he did not warrant, he is not liable.

*George L. Potter,* on same side,
Cited *Cowles* v. *Painter,* 4 Cushm. 256; *Jones* v. *Halchett,* 14 Ala. 745; Story on Bailments, 289; 1 Stark. Ev. 451.

*John B. Coleman,* for defendant in error,
Reviewed at length the evidence in the cause, and insisted, that the preponderance was in favor of the hypothesis, that the contract was entered into in accordance with the testimony of Holmes. He then argued as follows:—

But if this court should entertain a different opinion—if they should think that, sitting on a jury, they would have rendered a different verdict, still it must be conceded to have been a case of conflicting testimony. And it must also be conceded, that there was evidence before the jury sustaining their verdict. Such being the case, this court will not disturb the verdict. If, in the opinion of the court, the verdict was not clearly right, it is very certain, we think, that it was not manifestly wrong. *Prewett* v. *Coopwood,* 1 George, 369.

And the general rule laid down by this court, through a series of adjudications, is, that inasmuch as the jury are the judges of the facts submitted to them, their verdict upon these facts will never be set aside, unless the preponderance of testimony against the verdict be very great,—unless the verdict be manifestly wrong. *Dickson* v. *Parker,* 3 How. 219; *Collins* v. *Money,* 4 Ib. 11; *Harris* v. *Hallsday,* Ib. 338; *Leflon* v. *Justice,* 1 S. & M. 381; *Ellgery* v. *Stone,* 5 Ib. 21; *Fisher* v. *Leach,* 10 Ib. 313; *Mann* v. *Manning,* 12 Ib. 615; *Peck* v. *Thompson,* 1 Cushm. 367; *Garland* v. *Stewart,* 2 George, 314.

It will possibly be contended, that Drake was justified in removing the cotton to the frame shed, by reason of his having given notice to Surget's agent.

If the contract was, as testified to by Captain Holmes, for the storage of the cotton in the brick shed, without any limitation as to the time it was to remain on storage; and if Surget's custom, as

Drake *v.* Surget.

proved by Broughton, was to keep his cotton stored till late in the spring, or early in the summer ; and if Drake knew of this custom, as Broughton says he did, then even if Drake had given notice to Surget to remove it, or to ship it, Drake would not have been justified in removing it, without the assent of Surget, before the period at which Surget had been accustomed to ship it. This we take to be clear.

But Drake never gave any such notice. There is no attempt at proof of notice to Surget himself. Captain Holmes was Surget's sole agent, and he swears that he never received any notice. Notice to the brother of Captain Holmes, was no notice at all, for he was not the agent of Surget, nor was he the agent of Captain Holmes, in regard to Surget's business. And the statement of Purcell, that he gave notice to Captain Holmes on his return from the North, is, in the first place, denied by Captain Holmes, and in the second place, amounts to nothing, for the reason that it is not shown when Captain Holmes returned from the North, or at what time after his return, the notice was given to him. *Non constat*, that it was not the very day before the cotton was removed and burnt.

Again, there is a count in the complaint, averring a delivery of the cotton to Drake, to be by him safely and securely kept, and an allegation that it was so negligently and carelessly kept, that by reason thereof it was burnt.

David Shroeder, one of defendant's witnesses, proves that it rained the day before the fire, and that lime was stored in the frame shed, with Surget's cotton.

The origin of the fire being unexplained, may not the jury have legitimately inferred, that it originated from the lime; and if it did, would not Drake have been liable as a mere bailee, for the loss of the cotton, in consequence of his gross negligence, in storing so combustible a material as lime in the same shed with the cotton?

2d. The second ground assigned in support of the motion for a new trial, is, that the court erred in the instructions given for the plaintiff.

Upon a careful re-examination of the three instructions given on behalf of the plaintiff, they appear to us to be so entirely in accordance with law, that we presume that this ground of error was

assigned merely *pro forma.*   Nor were exceptions reserved to them at the time.

3d.  The third ground assigned for the granting of a new trial, is, that the court erred in ruling out part of the deposition of Purcell.

The part ruled out, was his statement of the answer which Drake directed him to give to Holmes, in case he (Drake) did not see Holmes himself, and also his (Purcell's) understanding of what the contract was, he not being present, nor hearing the contract made.

The answer of Drake, not having been delivered to Holmes, was nothing more than Drake's statement to Purcell, of the kind of contract he was willing at that time to make with Holmes.   Drake having subsequently seen Holmes, and made a contract with him, that contract can only be proved by the testimony of those who were present at its making, or by the subsequent acts or admissions of the parties to it.   It most certainly cannot be proved by evidence of statements, made by *either of the parties beforehand,* as to the kind of contract either of them was willing or intended to make.   It may well be, that when Drake told Purcell what to say to Holmes, he may have had his mind made up as to the character of the contract he was willing to make, and yet, when he afterwards saw and talked with Holmes, that he may have entered into a very different contract.   A man who wants to purchase my horse, for which I ask two hundred dollars, may send me word that he will give me one hundred and fifty dollars for him, and not a cent more; and yet, when he and I subsequently meet, he may conclude to give me the two hundred dollars.   The actual contract between us could not, surely, be proved by evidence of this previous offer of his.

Purcell's understanding of what the contract was, was of course inadmissible, he not being present, and not hearing it made; unless, indeed, he got his information from Surget or Holmes; and this is not pretended.

*W. T. Martin,* on same side,

Cited *Prewett* v. *Coopwood,* 30 Miss. R. 387; *Gay* v. *Lemle,* 32 Ib. 309; 1 S. & M. 381; 12 Ib. 615; *Dorr* v. *Watson,* 6 Cushm. 395; *Riggs* v. *The State,* 30 Miss. R. 652.

HARRIS, J., delivered the opinion of the court.

The defendant in error instituted this suit against the plaintiff, to recover the value of one hundred and fifteen bales of cotton, stored with plaintiff, and lost by fire. The complaint contains six counts.

The two first counts purport to be founded on special contracts, entered into on the 1st September, 1854, by plaintiff in error, as warehouseman, with defendant, *"for a reasonable storage and reward,"* to safely and securely store and keep the cotton of defendant, *" in his brick shed or warehouse,"* until he should order the same to be shipped.

The third and fourth counts charge a delivery of the cotton, to be safely kept for a *reasonable reward,* and to be redelivered to the defendant in error, on request, and aver breaches in not safely keeping and not redelivering said cotton.

The fifth and sixth counts are for money had and received, and on an account stated.

The plaintiff in error filed a general denial; and on this issue the cause was submitted to a jury, and verdict rendered for the defendant in error, for $4404 15½.

A motion for a new trial was made on the grounds,—

1. That the court erred in the instructions given for the plaintiff.

2. In ruling out part of the deposition of Tobias Purcell.

3. The verdict was contrary to law and evidence.

4. The damages are excessive and unreasonable.

This motion was overruled. To which judgment, a bill of exceptions was taken and filed, and the cause brought to this court upon writ of error. It is assigned for error,—

1. The ruling out part of the deposition of Purcell.

2. The granting instructions asked by defendant in error.

3. The refusal of a new trial.

The first ground of error relied on is, that the court erred in ruling out that part of Purcell's testimony, in which, in speaking of the message sent by Holmes through him to Drake, he relates *Drake's reply thereto.* This was previous to the date of the contract, according to the testimony of all the witnesses except Holmes. It in no manner tends to show what the actual contract was. Even

if it had been communicated to Holmes, it would not still afford any evidence that *he* had assented to the proposition made.

The "*principal fact*" under consideration is, what was the contract? This message and the reply were not contemporaneous with the contract, nor connected with it, nor were they calculated in any manner to illustrate it. They were not, therefore, admissible as part of the *res gestæ*. If designed to contradict Holmes's statement as to the *time* when the contract was made, it could not be ground of error that the *reply* of Drake was ruled out, because his reply to the message of Holmes, could not have more fully established that no contract was *then existing*, than the message which was admitted in evidence did.

Indeed, the proof was so full on this subject, that no contract was made until in October, that the defendant could not have been prejudiced by the rejection of this testimony, if it were admissible for this purpose.

The next error relied on, is the granting instructions asked by the defendant in error.

No objection was made to the instructions at the time they were given. They are not indorsed by the clerk as given, under the statute, so as to make them a part of the record. Nor does it appear that any step was taken by plaintiff in error to reserve objections to the instructions, if any objection was made, until after the verdict of the jury, on the motion for a new trial.

Prior to the act requiring the clerk to *mark* all instructions asked by either party, or given by the court, as being given or refused, the party desiring to avail himself of objections to instructions, was compelled to do so by bill of exceptions, *taken at the time.* After the passage of that act, the party objecting might either save his objection by bill of exceptions, or by having the instruction marked by the clerk, as the statute required. But if he does neither, and makes his objection for the first time on a motion for new trial, and embodies the instructions in his bill of exceptions taken on the refusal to grant the new trial, such exceptions will only be regarded here, as an exception to the refusal to grant a new trial; and the instructions thereon recited, will not be reviewed in this court. *Anderson* v. *Hill,* 12 S. & M. 682; *Field* v. *Weir,* 28 Miss. R. 67,

68; *L. Mayer & Co.* v. *McLure, Administratrix*, Opinion Book, 457, just delivered; 4 How. 122; 9 S. & M. 34.

The last ground of error insisted on is, that the court erred in refusing a new trial.

The doctrine is well established by a series of adjudications, that on a motion for a new trial, brought to this court by writ of error, the verdict of the jury will not be disturbed, unless where it is without evidence, or the evidence greatly preponderates against it, or where the verdict appears to be *manifestly wrong*, from the record before us.    3 How. Miss. R. 219; 4 How. Miss. R. 338; 7 How. Miss. R. 340; 1 S. & M. 381; 5 S. & M. 21; 7 S. & M. 715; 8 S. & M. 324, 643; 10 S. & M. 313; 12 S. & M. 336, 604, 614, 615; 13 S. & M. 202, 599, 656; 30 Miss. 387; 31 Miss. 315.

Testing the cause before us by these established rules, we think this ground of error is well taken:

1st. Because the verdict of the jury is *without evidence* to support the *contract* declared on.    There are four special counts, declaring on a special contract, in each case for storage "*for a reasonable reward*," when the proof shows a special agreement to store plaintiff's cotton *in the brick shed, at twenty cents per bale*.    There is no count stating a special contract to store plaintiff's cotton in the brick shed, *for twenty cents per bale*.    And all the proof agrees that there was a special contract, and that this was *the sum agreed on*, as a consideration for storage.    No witness proves any count in the declaration as laid; no witness sustains the contract alleged in the several counts of the complaint,—that the consideration agreed on, was "*reasonable reward.*"

2d. The verdict is without evidence to support the contract alleged in the complaint, in this: the contract, as stated in the first two counts, is as follows: "The defendant, in consideration that the plaintiff, at the special instance and request of the defendant, would deliver to the said defendant certain cotton of him, the said plaintiff, to be by him, the said defendant, safely and securely kept and stored in the brick shed or warehouse of him, the said defendant, in said town of Rodney, *until the said plaintiff should order the same to be shipped, for reasonable storage and reward to him, the said defendant, in that behalf, to be paid* by said plaintiff; he, the said defendant, undertook, and then and there promised the

said plaintiff, that he would safely and securely store and keep the said cotton, so to be delivered to him as aforesaid, in his said brick shed. or warehouse, *until he, the said plaintiff, should order the same to be shipped."*

The second count only varies from the above, in declaring upon a special contract, *after the cotton had been delivered,* stating it otherwise, in the same terms as the first count.

Besides the failure to prove the contract as laid, for *"reasonable storage or reward,"* there is no witness who proves that the contract was, that the defendant should keep the cotton safely or otherwise, *" until he the said plaintiff should order the same to be shipped."*

Rice *directly disproves* this part of the alleged contract, and all the circumstances go strongly to corroborate his statement, in this respect; the storage was for twenty cents per bale, and not per month, and could not, therefore, be presumed to have been at *the will of plaintiff.* The " brick shed," as the proof shows, was used to store pork, and needed for *that* business, and could not have been so used with plaintiff's cotton there; besides other circumstances, tending to show the truth of Rice's statement in this respect.

Holmes himself, however, *distinctly* states, that " no time was limited as to when the cotton was to be shipped; but it was to remain in the brick shed, until plaintiff wanted to ship it."

Again he says : *" There was no condition, or limitation in the contract, as to the time plaintiff's cotton was to remain in storage."* And again : *" Witness does not recollect that anything was said, in his conversation with Drake, about how long the cotton was to remain in store,* nor about the brick shed being wanted by Drake for the pork season, *because nothing of the kind was said."*

It seems, therefore, from Holmes's testimony, as stated in the record, that although he supposed, or inferred, that the cotton would remain in store with Drake, until plaintiff saw fit to ship it, that yet there was no such time mentioned, no such *condition* or *limitation agreed on;* that " nothing was said, in the conversation with Drake, *about how long the cotton was to remain in store."*

" As the plaintiff is bound to declare, on a special agreement, where there is such, he ought to prove *the contract as stated in his*

Drake v. Surget.

*declaration expressly as laid*, or he shall be nonsuited." 2 Tucker's Com. 148–9, and numerous authorities cited.

Where the plaintiff declares on a special contract, and also files the common counts, if at the trial he proves a special agreement, but different from that laid in his declaration, the plaintiff cannot recover on either count. He cannot recover on the special count, because of the variance between the contract alleged and the contract proved, nor can he recover on the common counts, because there was a special contract. 1 Str. 648; Bull. N. P. 139; 6 Tenn. R. 325.

" The doctrine here stated rests upon the sound principle, that where there is a special contract for an *agreed price*, the plaintiff cannot recover on the *quantum meruit*, because, on that count, the measure of damages is the value of the services, which peradventure may be more than the price agreed on. Nor can he recover upon the special agreement proved, if it differ from that laid in the declaration; because the defendant would be taken by surprise, if when he is charged with having made ·*one* contract, the plaintiff should be permitted, without giving him notice to prepare for his defence, to prove *another*. It is for this reason, among others, that the *allegata et probata* must agree." 2 Tuck. Com. 149.

" Thus also in actions upon contract, if *any part of the contract proved*, should vary materially from that which is stated in the pleadings, it will be fatal; for a contract is an entire thing, and indivisible." . . . . . . " The entire consideration must be stated, and the entire act to be done, in virtue of such consideration, together with the time, manner, and circumstances; and with all the parts of the proposition, as thus stated, the proof must agree." 1 Greenleaf Ev. 89, 90, 91, §§ 66, 67, 68.

" The consideration is descriptive and material, and must be strictly proved as laid." 1 Greenleaf Ev. §§ 58, 68, and numerous cases cited in notes.

There is no evidence, in the case before us, to sustain the special contract declared on. The proof shows that there was a special contract, different from that laid in the declaration; it follows, therefore, that the plaintiff was not entitled to recover, under the pleadings and proofs in this record, and a new trial should have been awarded.

For this error, let the judgment be reversed, cause remanded, and a *venire de novo* awarded.

HANDY, J., delivered the following dissenting opinion.

I agree in the conclusion that the judgment should be reversed; but I cannot concur in the view taken by the majority of the court, that, under the averment in the declaration that the defendant had agreed to store the cotton for " a reasonable reward," it was not competent to prove that he had agreed to do so for a stipulated sum.

The gist of the action was the violation of the defendant's duty, to store and keep the cotton according to his contract. It was immaterial, for the purposes of the action, what compensation he was to receive for the service, and whether it was stipulated or not, provided he was to receive a consideration for it. The question was, whether he had failed to perform his contract, to store and keep the cotton, not what particular compensation he was to receive for it; and it is clear that if he was to receive any compensation for it, he is liable for a breach of his contract. The amount of the remuneration to be paid, did not at all affect the defendant's liability for a breach of his contract; and hence, all that was necessary to be shown was, that a compensation was to be paid; and whether stipulated or not, was wholly immaterial to the action for a breach of his contract, by which the plaintiff lost his cotton. In such cases the rule is well settled, that it is not necessary to specify the amount of remuneration stipulated to be given, and it is sufficient to state in the declaration, that the retainer was " for certain reasonable reward." 1 Chitty Pl. 296 (8th Amer. edit.)·

But if this objection was available at all, it should have been made on the ground of variance, when the evidence was offered, and it was too late to raise it on motion for a new trial, and after it had been shown by the evidence that the contract was supported by a sufficient consideration. *Whitehead* v. *Gratham*, 2 Bing. 464 (9 Eng. C. L. Rep.)